# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETA ALLISON,                        )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        1:21CV890
                                      )
KILOLO KIJAKAZI,                      )
Acting Commissioner of Social         )
Security,                             )
                                      )
                    Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Greta Allison, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security ("Defendant" or "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entries 8-14 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 18, 21; see also Docket Entry 19 (Plaintiff's Memorandum), Docket Entry 22 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 303-07), alleging an onset date of July 30, 2017 (see Tr. 303, 306). Upon denial of that application initially (Tr. 172-82, 204-12) and on reconsideration

(Tr. 183-97, 214-21), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 222-23). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 130-71.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 17-31.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 4-10, 16, 271-72, 411-13), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   [Plaintiff] last met the insured status requirements of the . . . Act on December 31, 2018.

2.   [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of July 30, 2017 through her date last insured of December 31, 2018.

. . .

3.   Through the date last insured, [Plaintiff] had the following severe impairments: degenerative disc disease of the lumbar spine, left-hip degenerative changes, DeQuervain's tenosynovitis and carpal tunnel syndrome (CTS), headaches, and morbid obesity.

. . .

4.   Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform light work . . . except she is able to alternate between

2

sitting and standing every thirty (30) minutes; she has an unlimited ability to balance, can frequently kneel and crawl, and can occasionally climb, stoop, and crouch, as well as have only occasional exposure to hazards, such as unprotected heights and large moving machinery. Also, she can frequently use hand controls, handle, and finger with the bilateral upper extremities. [Plaintiff] is able to sustain attention and concentration to perform repetitive tasks that can be learned in 60 days or less in a work setting that does not require a consistent fast pace or strict production quotas.

. . .

6. Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10. Through the date last insured, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [she] could have performed.

. . .

11. [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from July 30, 2017, the alleged onset date, through December 31, 2018, the date last insured.

(Tr. 22-31 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

3

Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence

4

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro,

_____

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations
(continued...)

7

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to adequately account for the vocationally limiting effects of Plaintiff's migraine headaches in the RFC" (Docket Entry 19 at 4 (bold font and single-spacing omitted));

2) "[t]he structure of the SSA is constitutionally invalid" (id. at 7 (bold font omitted); and

3) "[t]he ALJ's appointment violates the Appointments Clause" (id. at 13 (bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (See Docket Entry 22 at 4-36.)

**1. Migraine Headaches**

In Plaintiff's first issue on review, she asserts that "[t]he ALJ failed to adequately account for the vocationally limiting effects of Plaintiff's migraine headaches in the RFC."  (Docket Entry 19 at 4 (bold font and single-spacing omitted).)  More specifically, Plaintiff highlights her testimony and certain medical evidence regarding her headaches that she believes supported greater limitations in the RFC (see id. at 4-5 (citing

---

[4](...continued)
of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Tr. 151-52, 427, 498, 549, 614, 748, 786, 1631, 1633)), and argues that, "despite th[at] testimony and medical evidence, the ALJ . . . included no allowances for absences or time off-task in the RFC" and "inexplicably did not account for [Plaintiff]'s sensitivity to either light or noise, indicating that the only limitation for the headaches . . . in the RFC was a reduction to lower skilled work at a non-production pace" (id. at 5 (citing Tr. 28)). According to Plaintiff, the ALJ "d[id] not analyze **any** of the medical records relating to [Plaintiff]'s headaches," and failed to clarify "how frequently [the ALJ] believe[d Plaintiff wa]s experiencing th[o]se headaches, for what duration of time [the ALJ] believe[d] the headaches last[ed], and whether [Plaintiff] would be impacted by his [sic] photophobia and phonophobia." (Id. at 6 (emphasis supplied by Plaintiff) (citing Monroe v. Colvin, 826 F.3d 176, 189-90 (4th Cir. 2016), and Porterfield v. Berryhill, No. 1:18CV319, Docket Entry 18 at 7 (M.D.N.C. Aug. 6, 2019) (unpublished) (Webster, M.J.), recommendation adopted, slip op. (M.D.N.C. Aug. 23, 2019) (Schroeder, C.J.)).) Plaintiff additionally points out the VE's testimony "that being off-task more than ten percent of the workday" and "three or more absences a month would not be tolerated" by employers. (Id. at 5 (citing Tr. 167).) Plaintiff's arguments do not entitle her to relief.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R.

§ 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. <u>See</u> <u>Hines</u>, 453 F.3d at 562–63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). <u>See</u> 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. <u>See</u> 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination. <u>See</u> <u>Reid v. Commissioner of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014). However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." <u>Woods v. Berryhill</u>, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted). Here, the ALJ's decision supplies the necessary "accurate and logical bridge," <u>id.</u> (internal quotation marks omitted), between the evidence and her findings that Plaintiff's headaches (A) qualified as a severe impairment (<u>see</u> Tr. 22), but (B) did not cause limitations greater than the RFC's restriction to "repetitive tasks that can be learned in 60 days or less in a work setting that does not require a consistent fast pace or strict production quotas" (Tr. 26).

As an initial matter, Plaintiff's assertion that the ALJ "d[id] not analyze **any** of the medical records relating to [Plaintiff]'s headaches" (Docket Entry 19 at 6 (emphasis supplied by Plaintiff)) simply does not square with the ALJ's decision, which reflects the following analysis of the evidence relating to Plaintiff's headaches:

> In July 2018, [Plaintiff] was treated at the emergency room after tripping and falling, and getting a laceration on her forehead. These records note that [she] did not hit her head on the ground or loss [sic] consciousness. While on exam she had a superficial head laceration and small abrasion in her knees, she spontaneously moved all her extremities symmetrically with no focal deficits. Moreover, she had no tenderness to palpation about the cervical, thoracic, or lumbar spine. [She] subsequently sought additional care because of complaints of headaches, dizziness, lightheadedness, [] foggy head, sleep disturbance, and fatigue; although [CT] scan of [the] head and MRI of the brain showed no evidence of acute traumatic intracranial abnormality. In addition, examination showed normal strength and no cranial nerve or sensory deficit; and a follow-up neurological evaluation was essentially normal. Three months after her fall, she was released to full duty work without restrictions.
>
> . . .
>
> . . . [T]he [ALJ] concludes that the evidence of . . . headaches reduced [Plaintiff]'s concentrating, persisting, or maintaining pace to lower-skilled work at [a] non-production rate pace . . . .

(Tr. 27-28 (internal parenthetical citations omitted).) That analysis makes clear that the ALJ acknowledged 1) the July 2018 injury that caused Plaintiff to complain of daily headaches (see id. at 27 (citing Tr. 2744-45)), 2) that Plaintiff continued to report daily headaches and related symptoms through September 2018

(see id. (citing Tr. 2855-57, 2876-78)), and 3) that, in October 2018, Plaintiff's neurologist released Plaintiff to return to work full duty (see id. (citing Tr. 2882-83); see also Tr. 2883 (containing note from Plaintiff's neurologist, Dr. Giles Franklin Crowell, dated October 25, 2018, releasing Plaintiff "to full duty immediately with no restrictions in regards to her brain injury" (emphasis added))).

Consistent with that analysis, the ALJ found at step two of the SEP that Plaintiff's post-concussion syndrome failed to qualify as a severe impairment, because, "[a]lthough the existence of th[at] condition[ wa]s supported by some objective medical evidence, the resulting limitations did not last longer than twelve months." (Tr. 23 (emphasis added).) In contrast to Plaintiff's post-concussion syndrome, the ALJ found that Plaintiff's "headaches" qualified as a severe impairment, apparently based upon Plaintiff's testimony that she experienced migraine headaches during the time period from her onset date of July 30, 2017, to her injury on July 4, 2018, but that "they weren't as frequent" as after her July 2018 injury. (Tr. 150.) The medical records, however, do not contain any complaints of (let alone treatment for) migraine headaches from July 30, 2017, to July 3, 2018 (see Tr. 1639-1753; see also Tr. 1631 (treatment note dated July 9, 2018, indicating that Plaintiff "d[id] not have a well established

12

history of recurrent headaches" (emphasis added))),[5] or from October 25, 2018 (the date of Plaintiff's full-duty release by Dr. Crowell), to December 31, 2018, Plaintiff's date last insured (<u>see</u> Tr. 875-1331).[6] Thus, Plaintiff simply has not shown that the medical evidence should have compelled the ALJ to adopt limitations relating to time off-task, absence from work, and exposure to light and sound in the RFC to account for Plaintiff's headaches.

The ALJ's evaluation of the opinion evidence provides a further basis for the headache-based limitations in the RFC. In that regard, the ALJ found "somewhat persuasive" (Tr. 28) the opinions of the state agency medical consultants, who opined that Plaintiff remained capable of a range of light work without any limitation on the level of skill or the pace of such work (<u>see</u> Tr. 178-79, 192-93), noting that their "opinions [we]re supported by and consistent with the overall objective medical evidence of record at the time," but that "additional evidence received at the hearing level" (which would include Plaintiff's testimony) warranted the additional limitations to lower-skilled, non-production work (Tr. 28). The ALJ also discounted Plaintiff's temporary out-of-work notes issued while she continued to

---

[5] Plaintiff complained of a <u>sinus</u> headache on January 18, 2018 (<u>see</u> Tr. 1702), in the setting of an acute bout of "[s]inobronchitis" (Tr. 1703).

[6] Notably, Plaintiff cites only to evidence from July 9, 2018, to September 25, 2018, in support of her instant contentions (<u>see</u> Docket Entry 19 at 5 (citing Tr. 427, 498, 549, 614, 748, 786, 1631, 1633)), and she did not list headaches among her allegedly disabling conditions on any of her Disability Reports (<u>see</u> Tr. 322-29, 335-44, 375-81).

Case 1:21-cv-00890-CCE-LPA Document 23 Filed 01/10/23 Page 13 of 52

experience post-concussive symptoms (see id. (citing Tr. 2870); see also Tr. 2880), because Plaintiff's neurologist released her to work full duty without restrictions from her brain injury just three months after her fall (see Tr. 28 (citing Tr. 2883)). Significantly, beyond the temporary out-of-work notes, none of Plaintiff's medical providers opined that Plaintiff's headaches necessitated any limitations on her ability to work, and none opined that Plaintiff needed time off-task, days off work, or to avoid bright lights and noise, which further undermines Plaintiff's argument. See Lamonds v. Berryhill, No. 1:16CV1145, 2017 WL 1906755, at *10 (M.D.N.C. May 9, 2017) (unpublished) (finding that ALJ's omission of certain limitations from RFC "d[id] not constitute error, because no medical source of record opined that [the p]laintiff required [such limitations]"), recommendation adopted, slip op. (M.D.N.C. May 24, 2017) (Schroeder, J.); Spicer v. Astrue, No. CIV. 11-3679, 2013 WL 951582, at *14 (D. Minn. Feb. 11, 2013) (unpublished) (rejecting the plaintiff's argument that "ALJ failed to include [a certain limitation] in the RFC finding," which "[wa]s supported by [the plaintiff's] testimony," where "[n]o physician gave her th[at] restriction" and "the record d[id] not otherwise support [that] limitation"), recommendation adopted, 2013 WL 950850 (D. Minn. Mar. 12, 2013) (unpublished).

　　In light of the foregoing analysis, the Court should deny relief on Plaintiff's first assignment of error.

## 2. Constitutionality of SSA

In Plaintiff's second issue on review, she contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 19 at 7 (bold font omitted).) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause." (Id. (citing Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ___, ___, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (Id. at 8 (citing 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from Kilolo Kijakazi, the [A]cting Commissioner, and is therefore constitutionally defective" (id. at 9 (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ's decision must [] be vacated because he [sic] did not have the authority to hear or decide the case given the delegation of authority from [ A]cting Commissioner [Kijakzi] who

15

had no constitutional authority to head the [SSA]." (Id.)[7] Those arguments ultimately fail as a matter of law.

As an initial matter, the Commissioner concedes "that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 22 at 21 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).) However, the Commissioner notes that, "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused h[er] harm." (Id. (citing Collins v. Yellen, ___ U.S. ___, ___ - ___, 141 S. Ct. 1761, 1787-89 (2021)).) According to the Commissioner, "Plaintiff's separation of powers argument does not entitle her to a rehearing of her disability claim," because she "cannot show the required nexus between the removal

_____

[7] Plaintiff's arguments in her second assignment of error contradict each other to some extent. Plaintiff first asserts that "[t]he ALJ's delegation of authority in this case came from Kilolo Kijakazi, the [A]cting Commissioner" (Docket Entry 19 at 9 (emphasis added)), and then later contends that "the ALJ who denied Plaintiff's [claim] made her decision on February 12, 2021 pursuant to a delegation of authority from [then-Commissioner Andrew] Saul" (id. at 13 n.4 (emphasis added)). At the time of the ALJ's decision at issue in this case, February 12, 2021, Andrew Saul held the position of Commissioner of the SSA. See https://www.ssa.gov/history/commissioners.html (reflecting Saul's period of service as from "June 17, 2019" to "July 9, 2021") (last visited Jan. 6, 2023). In any event, the Court need not resolve the contradiction in Plaintiff's arguments because, as explained in the discussion of this assignment of error, the constitutional invalidity of the removal provision in Section 902(a)(3) did not strip either former Commissioner Saul or current Acting Commissioner Kijakazi of their power to delegate authority to ALJs to adjudicate cases such as Plaintiff's claim for DIB.

16

restriction she challenges and the denial of her benefits claim."
(Id. (capitalization and single-spacing omitted).)  For the reasons
that follow, the Commissioner's argument has merit.

Plaintiff first maintains that "the type of causation [argued
by the Commissioner] is not required in a case such as this one
which involves government actors exercising power which they did
not lawfully possess," and that, in such cases, "an individual need
not show direct prejudice and instead such harm is presumed."
(Docket Entry 19 at 9 (citing Collins, ___ U.S. at ___, 141 S. Ct.
at 1788).)  Plaintiff points out that "the majority [in Collins]
indicated that harm could not be presumed . . . because [that case]
did not involve a government actor's exercise of power that the
government actor did not lawfully possess." (Id. (citing Collins,
___ U.S. at ___, 141 S. Ct. at 1788).)  Plaintiff emphasizes that,
"[b]y contrast, . . . the ALJ did not have a lawful delegation of
authority under which to adjudicate and decide this disability
claim" (id.) and thus "the analysis of Collins suggests that harm
should be presumed for the violation of [Plaintiff]'s
constitutional rights" (id. at 10 (emphasis added)).  Plaintiff
additionally contends that, "[a]lthough it was decided in the
Appointments Clause context, the Fourth Circuit has held that when
structural constitutional claims involving separation of powers are
concerned, an individual need not show direct prejudice to their

17

disability claim and instead such harm is presumed." (Id. (citing Probst v. Saul, 980 F.3d 1015, 1023 (4th Cir. 2020)).)

Plaintiff's attempt to read into Collins a "suggest[ed]" presumption of harm (id.), as well as her reliance on Probst (see id. (citing Probst, 980 F.3d at 1023)), an Appointments Clause case where the court found unconstitutional the very authority under which a government official acted, see Probst, 980 F.3d at 1023, both fail for the same reason: the unconstitutional removal provision at issue here did not impact then-Commissioner Saul's (or current Acting Commissioner Kijakazi's) ability to carry out the duties of the office, see Collins, ___ U.S. at ___, 141 S. Ct. at 1789 (requiring showing that "unconstitutional provision [] inflict[ed] compensable harm"); see also Decker Coal Co. v. Pehringer, 8 F.4th 1123, 1137 (9th Cir. 2021) ("Collins is controlling with respect to the remedy for any unconstitutionality in the removal provisions."). As another court recently explained:

> [The p]laintiff's argument is similar to arguments the plaintiffs raised and the [United States Supreme] Court rejected in Seila Law and Collins. First, like the plaintiffs in Seila Law, [the p]laintiff here argues § 902(a)(3)'s removal provision automatically renders all agency action unconstitutional. The [Supreme] Court in Seila Law rejected such an argument[,] observing one section of a statute may violate the Constitution without rendering the entire act void. Seila Law, 140 S. Ct. at 2209. The [Supreme] Court stated the removal limitation of the CFPB Director is the only defect and removal of the defect removes the constitutional violation. The [Supreme] Court concluded the removal limitation was severable because the CFPB is capable of functioning independently of the infirm removal clause. Id. [] ("The provisions of the Dodd-Frank Act bearing on the CFPB's

structure and duties remain <u>fully operative</u> without the offending tenure restriction. Those provisions are capable of functioning <u>independently</u>, and there is nothing in the text or history of the Dodd-Frank Act that demonstrates Congress would have preferred no CFPB to a CFPB supervised by the President."); <u>see also</u> [<u>id.</u>] at 2245.

. . .

The Supreme Court in <u>Collins</u> also rejected the argument an invalid removal provision rendered the [Federal Housing Finance Agency ('FHFA')]'s actions void from the outset. The Supreme Court stated there was "no reason to hold that the third amendment [to the agreement between the FHFA and the Department of Treasury] must be completely undone." <u>Collins</u>, [141 S. Ct.] at 1788. The <u>Collins</u> Court further stated "[a]lthough the statute unconstitutionally limited the President's authority to remove the confirmed Directors, <u>there was no constitutional defect in the statutorily prescribed method of appointment to that office</u>. As a result, there is no reason to regard any of the actions taken by the FHFA [challenged on appeal] as void." [<u>Id.</u>] at 1787. Accordingly, the argument the SSA's actions here are either void <em>ab initio</em> or became void at some later point due to § 902(a)(3)'s removal clause is not supported by either <u>Seila Law</u> or <u>Collins</u>.

<u>Lisa Y. v. Commissioner of Soc. Sec.</u>, 570 F. Supp. 3d 993, 1002-03, (W.D. Wash. 2021) (emphasis added) (internal footnote, citation, and stray parenthesis and period omitted); <u>see also</u> <u>Robinson v. Kijakazi</u>, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (unpublished) ("[The p]laintiff . . . simply argues that all actions taken by the Commissioner are void due to the unconstitutional removal provision. However, <u>Collins</u> expressly rejects this view." (internal citation omitted)), <u>aff'd</u>, No. 21-2258, Docket Entry 12 (4th Cir. Jan. 5, 2023) (unpublished)

19

(holding that the plaintiff's "challenge to the constitutionality of the ALJ's appointment lacks merit").

Plaintiff additionally contends that, "[e]ven if a causal connection between the government's violation of the Constitution and Plaintiff's injuries were required for Plaintiff to receive a remedy, Plaintiff has still satisfied that requirement." (Docket Entry 19 at 11.) In that regard, Plaintiff asserts that, "'but for' the unlawful delegation of authority to this ALJ, this government actor could not have adjudicated and issued the adverse determination which she did in this case," and that "[i]t is impossible to have a more direct 'but for' proof of causation than this." (Id.)

Plaintiff's actual harm argument relies on the same faulty premise as his presumed harm argument, i.e., that the unconstitutional removal provision applying to then-Commissioner Saul (or current Acting Commissioner Kijakazi) necessarily nullified the power to delegate authority to the ALJ to make a decision in Plaintiff's case. Neither Seila Law nor Collins support that position. See Collins, ___ U.S. at ___, 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the FHFA Director of the power to undertake the other responsibilities of his office." (emphasis added)); see also Seila Law, 591 U.S. at ___, 140 S. Ct. at 2209 ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain

20

<u>fully operative</u> without the offending tenure restriction.  Those provisions are capable of functioning <u>independently</u> . . . ." (emphasis added)).  Plaintiff has not provided the Court with any basis on which to distinguish <u>Seila Law</u> or <u>Collins</u> with regard to a showing of actual harm.  (<u>See</u> Docket Entry 19 at 7-13.)

Moreover, cases that have found a "redressable" or "traceable" injury arising from the unconstitutionality of Section 902(a)(3) have done so only in the context of deciding, as a preliminary matter, whether the plaintiff had <u>standing</u> to assert his or her <u>Seila Law/Collins</u>-based claim and did <u>not</u> address the ultimate merits of the claim.  <u>See</u> <u>Dixie C. v. Kijakazi</u>, No. 3:21CV764, 2021 WL 4822838, at *6 (N.D. Tex. Sept. 20, 2021) (unpublished) ("[B]ecause [the p]laintiff has established both traceability and redressability for the purposes of <u>standing</u>, the [c]ourt has standing to hear [the p]laintiff's constitutional claim." (emphasis added)), <u>recommendation adopted</u>, 2021 WL 4820764 (N.D. Tex. Oct. 15, 2021) (unpublished); <u>Sylvia A. v. Kijakazi</u>, No. 5:21CV76, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021) (unpublished) ("The [c]ourt finds that [the p]laintiff's separation-of-powers claim is both traceable and redressable such that she has <u>standing</u> to pursue it.  Thus, all of [the p]laintiff's claims should proceed to briefing on the merits." (emphasis added)), <u>recommendation adopted</u>, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021) (unpublished); <u>Albert v. Kijakazi</u>, No. 1:21CV4, 2021 WL 3424268, at *5 (D. Alaska Aug. 5,

Case 1:21-cv-00890-CCE-LPA   Document 23   Filed 01/10/23   Page 21 of 52

2021) (unpublished) ("Because [the] plaintiff has <u>standing</u> to bring his constitutional claim, [the Commissioner]'s motion to dismiss is denied." (emphasis added)); <u>Tafoya v. Kijakazi</u>, No. 21CV871, 2021 WL 3269640, at *3 (D. Colo. July 29, 2021) (unpublished) ("While ultimately, the righteousness *vel non* of [the plaintiff's] arguments on the merits may gain [her] little, if anything, the question presently before [the court] is one of <u>standing</u>, and thus does not implicate the merits." (footnote omitted) (emphasis added)).[8]

Indeed, in two such cases, the courts expressed doubt that the plaintiffs' <u>Collins</u>-based claims could succeed on the merits:

> The outcome of <u>Collins</u> is even less auspicious for [the] plaintiff's substantive claim. The [Supreme] Court there rejected the appellant's argument that the actions of the Director of the FHFA of which appellant complained were void:

---

[8] Cases exist to the contrary on the standing issue. <u>See</u> <u>Helms v. Commissioner of Soc. Sec.</u>, No. 3:20CV589, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021) (unpublished) ("The [c]ourt finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected [the] ALJ[ ]'s decision or any other aspect of the administrative litigation in a material way. Because [the p]laintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality."); <u>Catherine J.S.W. v. Commissioner of Soc. Sec.</u>, No. 3:20CV5602, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021) (unpublished) ("Because [the p]laintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner [Andrew] Saul, . . . the [p]laintiff's situation is distinguishable from the plaintiff's claims in <u>Collins</u>; [the p]laintiff has failed to establish standing . . . ."); <u>Amanda B. v. Commissioner, Social Security Administration</u>, No. 3:20CV434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) (unpublished) ("[The p]laintiff . . . does not allege that the SSA Commissioner took any action that is in any way related to the ALJ's decision or the decision by the Appeals Council."); <u>Brinkms v. Kijakazi</u>, No. 2:21CV528, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) (unpublished) ("Because [the p]laintiff offers nothing that traces the decision by the ALJ . . . to any alleged injurious conduct by the SSA Commissioner, [the plaintiff] has not demonstrated traceability and her constitutional violation claim fails for lack of standing.").

> All the officers who headed the FHFA during
> the time in question were properly *appointed*.
> Although the statute unconstitutionally
> limited the President's authority to *remove*
> the confirmed Directors, there was no
> constitutional defect in the statutorily
> prescribed method of appointment to that
> office.
>
> Collins, 141 S. Ct. at 1787 (emphases in original).
> Accordingly, "the unlawfulness of the removal provision
> does not strip the Director of the power to undertake the
> other responsibilities of his office," including
> implementing the provision of which the appellant
> complained. Id. at 1788 n.23. It thus may well be that,
> even if the removal provisions of the [] Act
> are unconstitutional, the [SSA]'s ALJs still had authority to
> issue disability determinations.

Tafoya, 2021 WL 3269640, at *3 n.6; see also Dante v. Saul, Civ.

No. 20-702, 2021 WL 2936576, at *5 (D.N.M. July 13, 2021)

(unpublished) ("Th[e] rationale [in Collins] appears to undermine

[the p]laintiff's position that the Commissioner acted outside his

constitutional authority when he delegated authority to the ALJ to

decide [the p]laintiff's disability claim. But, curiously, the

[Supreme] Court's analysis in Collins also supports a finding that

[the p]laintiff has standing to assert a constitutional claim under

this now-questionable theory." (italics omitted, underscoring

added)). Thus, cases decided in the standing context do not

provide a basis for the Court to find actual harm to Plaintiff

arising from Section 902(a)(3)'s removal provision. See Collins,

___ U.S. at ___, 141 S. Ct. at 1788 n.24 ("What we said about

standing in *Seila Law* should not be misunderstood as a holding on

23

a party's entitlement to relief based on an unconstitutional removal restriction.").

Plaintiff next attempts to show actual harm by asserting "that President Biden wished to terminate [then-]Commissioner [Andrew] Saul immediately upon assuming the Presidency," and that "the White House [] affirmatively and immediately sought advice from [the] DOJ as to whether President Biden could fire [then-]Commissioner Saul after the Supreme Court issued its decision in *Collins*." (Docket Entry 19 at 11-12 (citing 2021 OLC Op., 2021 WL 2981542, at *1).) Plaintiff also notes that "[t]he day after [the] DOJ issued [the 2021 OLC Op.] in the wake of *Collins* confirming that [then-Commissioner] Saul could be removed from office by the President, President Biden immediately did so." (Id. at 12 (citing Tafoya, 2021 WL 3269640, at *3).) Plaintiff additionally relies on an online article on the Federal News Network website which quotes a statement from an unidentified "White House official" regarding the dismissal of then-Commissioner Saul, indicating that he "'ha[d] undermined and politicized Social Security disability benefits'" and "'reduced due process protections for benefits appeals hearings.'" (Id. (citing https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner (July 9, 2021)).) Plaintiff thus argues that "President Biden's concerns about [then-Commissioner] Saul's policy actions went to the very fundamentals of the entire disability adjudication process." (Id. at 13.) In

24

Plaintiff's view, given that President Biden believed then-Commissioner Saul had undermined due process "'[s]ince taking office' in 2019" (id. (quoting https://federalnews network.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), and that "President Biden [] immediately remov[ed then-Commissioner] Saul from office the day after [the] DOJ issued [the 2021 OLC Op.,] . . . it is unmistakable that President Biden would have fired [then-]Commissioner Saul immediately upon taking office had [President Biden] believed it was legal" (id.; see also id. n.4 (pointing out that "the [Supreme] Court indicated in *Collins* that[,] in a situation where 'the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way[,] . . . the statutory provision would **clearly** cause harm'" (quoting *Collins*, ___ U.S. at ___, 141 S. Ct. at 1789 (underscoring added) (bolding supplied by Plaintiff) (some brackets omitted)) and noting that "the ALJ who denied Plaintiff's [claim] made her decision on February 12, 2021 pursuant to a delegation of authority from [then-Commissioner] Saul, with whom the President was displeased and [whom the President] would have likely dismissed but for the unconstitutional removal protections" (internal parenthetical citation omitted))). That argument misses the mark.

25

Although Plaintiff relies on an unidentified White House official's statement expressing dissatisfaction with then-Commissioner Saul's performance since he took office in 2019 (id. at 12 (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff fails to point to any actual facts demonstrating that President Biden wished to remove then-Commissioner Saul (let alone attempted to remove him and failed to do so as a result of Section 902(a)(3)), prior to the date on which the ALJ denied Plaintiff's claim (February 12, 2021) (see id. at 11-13). Moreover, beyond a vague reference to a reduction in unidentified "'due process protections for benefits appeals hearings'" (id. at 12 (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner)), Plaintiff has failed to show how President Biden's alleged inability to remove then-Commissioner Saul actually impacted the adjudication of Plaintiff's claim for benefits. As explained by another district court:

> In her reply brief, [the p]laintiff argues "[then-Commissioner] Saul's actions, under constitutional authority or not, have caused specific harm by undermining, politicizing and reducing due process protections to [the p]laintiff's claims." This argument that there is a possibility § 902(a)(3) harmed [the p]laintiff fails to recognize the significant difference between the agency action in Collins and the SSA action here.
>
> In Collins, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which [the]

26

plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. Id. at 1774. The plaintiffs in Collins thus had an identifiable basis to contend that[,] but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment. See id. at 1789.

In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. [The p]laintiff has not identified any new regulations, agency policies or directives [then-]Commissioner Saul installed that may have affected her claims. [The p]laintiff thus fails to show how or why § 902(a)(3)['s] removal clause possibly harmed her.

Lisa Y., 570 F. Supp. 3d at 1003 (emphasis added) (internal citation omitted); see also id. at 1004 ("[A] conclusory allegation that due process was denied is not sufficient to raise a colorable constitutional claim." (citing Hoye v. Sullivan, 985 F.2d 990, 992 (9th Cir. 1992))); Shaun A. v. Commissioner of Soc. Sec., Civ. No. C21-5003, 2021 WL 5446878, at *5 (W.D. Wash. Nov. 22, 2021) (unpublished) ("[The p]laintiff's reference to an unnamed White House official's justification for [then-]Commissioner Saul's removal [does not] indicate that [the p]laintiff was harmed. . . . Although a representative of the President suggested that [then-]Commissioner Saul was removed from office in part because he had undermined, politicized, and 'reduced due process protections for benefits appeals hearings,' this statement does not establish the existence of a due process violation and [the p]laintiff has failed to identify one."). Similarly, Plaintiff here has not pointed the

27

Court to any "new regulations, agency policies or directives [then-]Commissioner Saul installed that may have affected her claims," Lisa Y., 570 F. Supp. 3d at 1003. (See Docket Entry 19 at 7-13.)

In short, Plaintiff's constitutional claim based on Seila Law and Collins lacks merit.

### 3. Appointments Clause

Plaintiff's third and final issue on review maintains that "[t]he ALJ's appointment violates the Appointments Clause" of the U.S. Constitution. (Docket Entry 19 at 13 (bold font omitted) (referencing U.S. Const. art. II, § 2, cl. 2).) In particular, Plaintiff contends that "[t]he ALJ's appointment by Nancy Berryhill on July 16, 2018, violates the Appointments Clause because Nancy Berryhill was no longer the Acting Commissioner on that date and, therefore, lacked the authority to ratify the ALJ's appointment." (Id. at 14 (internal parenthetical citation omitted).) According to Plaintiff, Berryhill "became Acting Commissioner of SSA on January 20, 2017, when President Donald Trump assumed office and then[-]Acting Commissioner Carolyn Colvin resigned." (Id. (citing U.S. Gov't Accountability Office ("GAO"), No. B-329853, "Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998- Commissioner, Social Security Administration," www.gao.gov/assets/700/690502.pdf, at 1 (Mar. 6, 2018) ("GAO Notice")).) Plaintiff points out that, "[o]n March 6, 2018, the GAO [Notice] reported that Berryhill's service as Acting Commissioner under the

28

[Federal Vacancies Reform Act ('FVRA')] had expired on November 16, 2017, and that her service after that date violated the FVRA." (Id. (citing GAO Notice, at 2).)   Plaintiff thus argues that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective because her period of acting service had expired on November 16, 2017, and the FVRA did not allow her to resume acting as Commissioner at a later date." (Id. (citing Brian T.D. v. Kijakazi, 580 F. Supp. 3d. 615, 629 (D. Minn. 2022), appeal filed sub nom Dahle v. Kijakazi, No. 22-1601 (8th Cir. Mar. 22, 2022).)   Plaintiff's argument falls short.

a.   The FVRA

Resolution of Plaintiff's third issue on review turns on interpretation of the FVRA, which:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required.  5 U.S.C. § 3345 et seq.  The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Id. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers.  Id. § 3345(a)(2)– (a)(3). . . .  The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency.  Id. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to

29

which" the FVRA applies "shall have no force and effect," id. § 3348(d)(1), and any such action "may not be ratified," id. § 3348(d)(2).

Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs., 496 F. Supp. 3d 31, 53 (D.D.C. 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021). The specific provision of the FVRA at issue in this case, governing the time limits on serving in an acting capacity under the FVRA, provides as follows:

(a) . . . the person serving as an acting officer as described under section 3345 may serve in the office--

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346 (emphasis added).

b.   Factual Background

30

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. See "Memorandum Providing an Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. See GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired on November 16, 2017. See GAO Notice, at 2.[9] Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO. See Patterson v. Berryhill, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished). On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA interpreted as permitting Berryhill to resume serving as Acting

---

[9] The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017). 5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017 constituted the 300th day after the January 20th inauguration.

Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision.  See Reuter v. Saul, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), recommendation adopted, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

On June 21, 2018, the United States Supreme Court issued Lucia v. Securities & Exh. Comm'n, 585 U.S. ___, 138 S. Ct. 2044 (2018), which held, based on its prior case Freytag v. Commissioner of Int. Rev., 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions." Lucia, 585 U.S. at ___, 138 S. Ct. at 2053 (internal quotation marks omitted).[10] Because the SEC ALJ who decided the plaintiff's case lacked "the kind of appointment the [Appointments] Clause requires," i.e., appointment by the "President alone," "the Courts of Law," or "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2, the Supreme Court "held that the appropriate remedy for an adjudication tainted

_____

[10] The Appointments Clause provides as follows:

[The President of the United States] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

with an appointments violation [wa]s a new hearing before a [different,] properly appointed official." Id. at ___, 138 S. Ct. at 2055 (internal quotation marks omitted).

Although "[Lucia] did not specifically address the constitutional status of ALJs who work in . . . the [SSA, t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the [DOJ], on July 16, 2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security." Id.

c. Brian T.D.

As discussed above, Plaintiff relies primarily on the reasoning in Brian T.D. to support her argument that "Berryhill's purported ratification of the ALJ in this case on July 16, 2018 was statutorily ineffective." (Docket Entry 19 at 14 (citing Brian T.D., 580 F. Supp. 3d at 629).) In that case, the court concluded that, because "Section 3346(a) [of the FVRA] applies to 'the person serving as an acting officer,'" Brian T.D., 580 F. Supp. 3d at 629 (emphasis added) (quoting 5 U.S.C. § 3346(a)), and because, "[w]hen Saul was first nominated to become Commissioner on April 17, 2018,

33

Berryhill was not then <u>serving</u> as Acting Commissioner," <u>id.</u> (emphasis added), "by its plain language, § 3346(a)(2) d[id] not apply to Berryhill," <u>id.</u>; <u>see also</u> <u>id.</u> (stating that "[c]ourts have frequently looked to Congress' choice of verb tense to interpret statutes," and that, "[w]hen a [c]ourt is determining the meaning of an Act of Congress, the present tense generally does not include the past" (citing <u>Carr v. U.S.</u>, 560 U.S. 438, 447 (2010) (in turn, citing the Dictionary Act, 1 U.S.C. § 1))).

The <u>Brian T.D.</u> court thereafter provided further interpretations of the FVRA that purportedly supported its above-described conclusion regarding Section 3346(a)(2)'s inapplicability to Berryhill, including that:

- "[s]ubsection [3346](b)(1) states that if a nomination is rejected, withdrawn, or returned, 'the person may **continue to serve** as the acting officer for no more than 210 days[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(1)), and "[s]ubsection [3346](b)(2) states that if a second nomination is unsuccessful, 'the person **serving** as the acting officer may **continue to serve**[,]'" <u>id.</u> (emphasis supplied by <u>Brian T.D.</u>) (quoting 5 U.S.C. § 3346(b)(2));

- "§ 3348 [of the FVRA] confirms this reading[ because, u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete," <u>id.</u> at 630 (quoting 5 U.S.C. § 3348(b)(1) & (2)); <u>see also</u> <u>id.</u> at 631 ("[t]o accept [the Commissioner]'s interpretation of § 3346(a)(2) would require the Court to ignore (or rewrite) § 3348");

- the Commissioner's interpretation of Section 3346(a) as "allow[ing] Berryhill to resume acting as Commissioner (that is, to spring back into that

34

position) when President Trump nominated Saul, even
though her initial statutory term had
expired . . . misreads the statutory language[,
because t]he word 'or' modifies the entire
provision that limits the acting officer to a
period 'no longer than' 210 days from the date the
vacancy arose[ and, t]hus, when read with the
entirety of subsection [3346](a)(1)[,] 'or' serves
to suspend that time limitation, not to create an
entirely separate and distinct period of service,"
id. (some internal quotation marks omitted)
(quoting 5 U.S.C. § 3346(a)(1)).

For the reasons more fully explained below, the Court should
decline to follow the reasoning of Brian T.D. and conclude that
Berryhill properly served as Acting Commissioner under the spring-
back provision of Section 3346(a)(2) at the time she ratified the
appointments of the SSA's ALJs in July 2018.

d.   Analysis

"Statutory construction must begin with the language employed
by Congress and the assumption that the ordinary meaning of that
language accurately expresses the legislative purpose," Park 'N
Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985);
however, in construing the text of the FVRA, Brian T.D.
misconstrues Congress's use of the present tense verb "serving" in
Section 3346(a)(1), Brian T.D., 580 F. Supp. 3d at 629.  In that
regard, the court noted that "Congress, in enacting § 3346, used
the present participle 'serving,' rather than the past or present
perfect 'served' or 'has served'" and thus that "Section 3346(a)
. . . applies to the person presently serving in that capacity and

35

not to a person who had previously served as Acting Commissioner."
Id. (emphasis added).

That argument, however, glosses over the fact that using "the past or present perfect 'served' or 'has served'" to set out the time limits for acting officials under the FVRA would not make sense.  Had Congress drafted Section 3346(a) to provide that "the person [who served or who has served] as an acting officer as described under section 3345 may serve in the office for no longer than 210 days," 5 U.S.C. § 3346(a)(1) (dashes and numbering omitted), the Section, by its terms, would provide service time limits only for individuals who had already served as acting officers, which renders the time limits nonsensical.  See United States v. Turkette, 452 U.S. 576, 580 (1981) (holding that, in construing statutory language, "absurd results are to be avoided"); see also Sorrells v. United States, 287 U.S. 435, 447 (1932) ("All laws should receive a sensible construction.  General terms should be so limited in their application as not to lead to . . . an absurd consequence."); Harris v. United States, 215 F.2d 69, 75 (4th Cir. 1954) (holding that "interpretation of a statute leading to absurd . . . results is to be avoided").  Construing the phrase "the person serving as an acting officer as described under section 3345," 5 U.S.C. § 3346(a) (emphasis added), as merely descriptive, i.e., as explaining that the time limits apply to acting officers under Section 3345 of the FVRA as opposed to acting officers under

36

other, office-specific vacancy statutes, constitutes a more straightforward and common sense interpretation of Section 3346(a).

Moreover, as the Commissioner argues:

> Reading § 3346(a)'s prefatory phrase to limit that subsection's application to only "the person presently serving in [an acting] capacity," Brian T.D., [580 F. Supp. 3d at 629], would also create an irreconcilable conflict with § 3345. Under the FVRA, the default rule is that the first assistant automatically becomes the acting official, but the President can subsequently displace the first assistant from her acting role by choosing another acting official. *See* 5 U.S.C. § 3345(a)(1)-(3); *see also Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019). But if § 3346(a) applied only to a "presently serving" acting officer, it would incorrectly bar the President from designating an alternative acting official. Were the President to designate an acting official after the first assistant had assumed the role by default, the alternative official would not be the person *presently* "serving as an acting officer as described under section 3345." Under the *Brian T.D.* court's misinterpretation of that phrase, § 3346(a) thus would not permit her to serve *at all* because § 3346(a)'s prefatory phrase applies to service under both § 3346(a)(1) and (a)(2). By the same token, were a first assistant serving as an acting official to die, resign, or otherwise be unable to serve during the vacancy, the President would be incapable of replacing her.

(Docket Entry 22 at 14-15.) The Court should construe the meaning of the word "serving" in Section 3346(a) in a manner that does not create inconsistencies with other provisions of the FVRA. See NLRB v. Wheeling Electric Co., 444 F.2d 783, 787 (4th Cir. 1971) ("The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect . . . and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd

37

result, courts must look beyond the plain words of the statute." (citations omitted)); <u>Milan Puskar Health Right v. Crouch</u>, 549 F. Supp. 3d 482, 490 (S.D.W. Va. 2021) ("[T]he [c]ourt . . . is obligated to avoid statutory interpretations that lead to absurd . . . results if 'alternative interpretations consistent with the legislative purpose are available.'" (quoting <u>Griffin v. Oceanic Contractors, Inc.</u>, 458 U.S. 564, 575 (1982))).

The <u>Brian T.D.</u> court next found that the "structure and context" of Section 3346 supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill. <u>Brian T.D.</u>, 580 F. Supp. 3d at 629. In support of that finding, the court noted that:

> [s]ubsection (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may **continue to serve** as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) states that if a second nomination is unsuccessful, "the person **serving** as the acting officer may **continue to serve**." <u>Id.</u> § 3346(b)(2) (emphasis added). Therefore, the plain language of § 3346, indicates that the use of the present participle is deliberate — only a person presently serving may continue to serve. The plain language of § 3346(a)(2) means that it only applies to a person presently serving as Acting Commissioner if at the time of nomination, someone "is performing the functions and duties" in accordance with the FVRA. There is no good reason for construing the word "serving" when used in the first paragraph of § 3346(a) differently than when it is used in § 3346(b).

<u>Id.</u> at 629-30.

As discussed above, interpreting the phrase "the person <u>serving</u> as the acting officer" in Section 3346(a) as descriptive

38

rather than as a limitation to individuals presently holding the acting official role comports with common sense. Moreover, the Brian T.D. court's emphasis on the "continue to serve" language in Sections 3346(b)(1) and 3346(b)(2) actually undermines that court's reasoning. In those sections, Congress made clear that an acting official may "continue to serve" in that role for 210 days after the failure of a first or second nomination to the Senate. 5 U.S.C. §§ 3346(b)(1), (b)(2). Had Congress wished to allow an acting official to continue to serve beyond the initial 210 days only if a nomination occurred during that initial 210-day period, Congress could easily have included that same "continue to serve" language in Section 3346(a)(2) but did not do so.

The Brian T.D. court next maintained that "§ 3348 confirm[ed its] reading" of Section 3346(a)(2) because, "[u]nless someone 'is performing the functions and duties' in accordance with the FVRA, the PAS office 'shall remain vacant' until the PAS-appointment is complete." Brian T.D., 580 F. Supp. 3d at 630 (quoting 5 U.S.C. § 3348(b)). The court disagreed with the Commissioner's "interpret[ation of] § 3346 as providing a person with authority to serve in an acting role (as distinct from merely defining the length of that service)," and pointed out that "§ 3345 [] provides the authority to act as an officer, while § 3346 merely defines the period of that service." Id. at 632. In other words, the court reasoned, "[s]omeone cannot avoid § 3348's directive that the

39

'office shall remain vacant' by invoking § 3346 as authority to serve as acting officer because § 3348 requires that person to already be performing duties according to §§ 3345, 3346, and 3347." Id.

The Brian T.D. court provided no authority for its interpretation precluding Berryhill from invoking Section 3346 to avoid the "remain vacant" provision of Section 3348(b) and to authorize the "spring back" into her role as Acting Commissioner upon the nomination of Saul, because Section 3346 prescribes only "time limits," id. See id. In fact, Section 3346(a)(2) does not just address "time limits," i.e., "for the period that the nomination is pending in the Senate," as that Section also prescribes a condition, i.e., a nomination to the Senate, which triggers an additional period of service. Moreover, Section 3348(b)(1) explicitly ties the "remain vacant" provision to the phrase "performing the functions and duties in accordance with sections 3345, 3346, and 3347," 5 U.S.C. § 3348(b)(1) (emphasis added), and, because Berryhill immediately resumed performing the duties of the office in an acting capacity upon Saul's nomination in accordance "with § 3346(a)(2) (as well as § 3345(a)), § 3348(b)(1) did not require the office to 'remain vacant'" (Docket Entry 22 at 16).

40

The _Brian T.D._ court further based its interpretation of Section 3346(a)(2)'s inapplicability to Berryhill on the following analysis of the meaning of the word "or":

> [The Commissioner's] interpretation [of Section 3346(a)] misreads the statutory language. The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service.
>
> A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; _**or**_ . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. _Id._ § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. _United States v. Smith_, 35 F.3d 344, 346 (8th Cir. 1994). In this statute "or" serves to provide an alternative _**length**_ of service not to create a series of non-contiguous periods of service. If the statute were read to create three distinct periods of service — the initial 210 days, the first nominee period, and the second nominee period — the statute would have used the word "and" to separate the three periods of service.
>
> Construing the word "or" to mean "and," as [the Commissioner] argues for here, is conjunctive and "clearly in contravention of its ordinary usage." _Id._ The plain reading and ordinary usage of the word "or" in § 3346(a) is that a person serving as Acting Commissioner may serve for a 210-day period from the start of the vacancy, _**or**_ if the person is already "serving as acting officer" according to the FVRA, may continue serving during the pendency of a timely nomination. The 210-day period is a limitation on Berryhill's acting service and after the 210-day limitation had expired, she could not later return to acting service, turning § 3346's "or" into an "and."

_Brian T. D._, 580 F. Supp. 3d at 631 (emphasis supplied by _Brian T.D._).

41

The Commissioner persuasively argues that the Brian T.D. court's above-quoted interpretation of the word "or" in Section 3346(a)(1) constitutes an unreasonable construction of that commonly-used word:

> The use of "or" to mean either one or both of two options is routine. "The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). "'The meaning of *or* is usually inclusive.'" *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. 05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995)). For example, if a server comes to a table and asks whether anyone would like "dessert or coffee," no one would interpret that to preclude ordering both.

(Docket Entry 22 at 9 n.2 (underscoring added).) Indeed, as well-explained by another district court:

> Authorities agree that . . . or has an inclusive sense as well as an exclusive sense." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011). In its inclusive sense, "or" means "A or B, or both." *Id.* In its exclusive sense, "or" means "A or B, but not both." *Id.* Although "or" is used in both senses in common usage, "[t]he meaning of or is usually inclusive." *Id.* (quoting Scott J. Burnham, *The Contract Drafting Guidebook* 163 (1992)) (internal quotation marks omitted).
>
> [The defendant] argues as if the court must choose between construing "or" in its exclusive sense or construing it to mean "and." But . . . both senses of "or" are commonly used. In fact, the inclusive use of "or" is the more common.

B-50.com, LLC v. InfoSync Servs., LLC, No. 3:10CV1994, 2014 WL 285096, at *6-7 (N.D. Tex. Jan. 27, 2014) (unpublished) (emphasis added) (certain citations omitted); see also Great Lakes Ins. SE v. Lassiter, No. 21-21452-CIV, 2022 WL 1288741, at *10 (S.D. Fla. Apr.

42

29, 2022) (unpublished) ("If the [p]olicy sought to use 'or' in an exclusive sense, then it would have prevented such overlap by prefacing the definition with a qualifier like '<u>either</u>.'" (emphasis added)); <u>Mason v. Range Res.-Appalachia LLC</u>, 120 F. Supp. 3d 425, 445 (W.D. Pa. 2015) ("'Stating the matter broadly, we can say that in a permissive sentence the inclusive "or" is interchangeable with the several "and." Again, <u>this does not say that "and" means "or</u>." It says that in such a context the two words are reciprocally related: the implied meaning of one is the same as the express meaning of the other.'" (quoting Maurice B. Kirk, <u>Legal Drafting: The Ambiguity of "And" and "Or</u>," 2 Tex. Tech L. Rev. 235, 243 (1971))); <u>Allstate Ins. Co. v. Plambeck</u>, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014) (noting that, "[a]bsent a qualifying '<u>either</u>,' 'or' is typically interpreted in the inclusive manner" and explaining that statute in question lacked "limiting words or phrases — such as '<u>either</u>' or '<u>but not both</u>' — that might support reading [the statute]'s use of 'or' in the 'exclusive' sense" (emphasis added) (internal quotation marks omitted)).

Here, the word "or" appears in a permissive sentence, i.e., "the person serving as an acting officer as described under section 3345 <u>may serve</u> in the office," 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as "either" and "but not both," <u>see</u> <u>id.</u> Accordingly, the Court should interpret the word "or" in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill

43

to serve both as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), and to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2). Notably, Congress did <u>not</u> include language in Section 3346(a)(2) clarifying that the period of service under that Section applied <u>only if the nomination to the Senate occurred during the pendency of the initial, 210-day period of service</u>. See <u>N.L.R.B. v. SW Gen., Inc.</u>, ___ U.S. ___, ___, 137 S. Ct. 929, 939 (2017) (rejecting NLRB's interpretation of Section 3345 of the FVRA, while noting that Congress "could easily have chosen clearer language," as well as finding that "'[t]he fact that Congress did not adopt [] readily available and apparent alternative [language] strongly support[ed]'" the Supreme Court's interpretation of Section 3345 (brackets omitted) (quoting <u>Knight v. Commissioner</u>, 552 U.S. 181, 188 (2008)).[11]

Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and

---

[11] Another section of the FVRA makes clear that Congress knew how to include language indicating that certain time periods for service did not permit breaks in service:

> [T]he President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department <u>without a break in service</u>, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

5 U.S.C. § 3345(c)(1) (emphasis added).

44

that Section 3346(a)(2) authorizes a second, permissible period of service for Berryhill:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added).[12] Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA. Compare S.2176, 105th Cong., § 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

The Brian T.D. court focused on a different part of the FVRA's legislative history to support its reasoning. Section 3348(b) of Senate Bill 2176 provided, in pertinent part, as follows:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs--
>
> (A) the office shall remain vacant until the President submits a first nomination to the Senate; and . . .
>
> (2) if the President does not submit a second nomination to the Senate within 150 days after the date of the rejection, withdrawal, or return of the first nomination--

_____

[12] The version of the FVRA Congress ultimately passed expanded the term an acting official could serve from 150 days to 210 days. See 5 U.S.C. § 3346(a).

45

(A) the office shall remain vacant <u>until the President submits a second nomination to the Senate</u>.

S.2176, 105th Cong., § 3348(b), available at www.congress.gov/bill/105th-congress/senate-bill/2176/text (emphasis added) (quotation marks omitted). The <u>Brian T.D.</u> court found that the absence of the above-emphasized language in FVRA's final text supported the court's interpretation of Section 3346(a)(2) as not applying to Berryhill:

> The FVRA's final text does not include the express "spring-back" language. Publ. L. 105-277, § 151, 112 Stat. 2681 (Oct. 21, 1998). Enacting the FVRA included a "period of intense negotiations" and resulted in "a compromise measure." *N.L.R.B.*, [___ U.S. at ___,] 137 S. Ct. at 942. "What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *Id.*
>
> Here, the Senate Report shows that the Senate considered allowing an officer who had previously acted as Commissioner to return to acting service upon a nomination to the Senate, however Congress chose not to include such language in the final, enacted version of the FVRA. Certainly, the original language of § 3348 demonstrates that if Congress had intended the FVRA to contain a spring back provision they were able to craft such language to clearly and unambiguously express that intent. At best the reliance on the Senate Report illustrates the folly of attempting to discern legislative intent from statements made during the legislative process. *See id.* at 942-93; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572[] (2011) ("When presented, on the one hand, with clear statutory language and, on the other, with dueling committee reports, we must choose the language.").

<u>Brian T.D.</u>, 580 F. Supp. 3d at 633.

<u>Brian T.D.</u>'s reasoning falls short, because the Senate Report did not tie its interpretation of Section 3346(a)(2) as a spring-

46

back provision to the language in Section 3348(b) providing that the office remain vacant "until the President submits a first [or second] nomination to the Senate," 5 U.S.C. § 3348(b) (emphasis added); rather, the Report grounded its interpretation in the language of Section 3346 itself:

> Under new section 3346(a)(2), . . . [t]he acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, 1998 WL 404532, at *14 (emphasis added). As the Commissioner argued in Brian T.D., the final version of the FVRA likely did not include the language in question from Senate Bill 2176's Section 3348, because the plain text of Section 3346(a) rendered that language unnecessary. See Brian T.D., 580 F. Supp. 3d at 633.

In addition, cases interpreting the application of Section 3346(a)(2) have also concluded that Section 3346(a)(2) serves as a spring-back provision. In a case outside of the SSA context, another district court held as follows:

> Executive Order [13753 ('EO 13753')] designated its order of succession [for the position of Secretary of the Department of Homeland Security ('DHS')] pursuant to the FVRA, which includes a 210-day time limit for acting officials "beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). Here, [Secretary of DHS Kirstjen] Nielsen resigned on April 10, 2019, and far more than 210 days passed before [the Acting Secretary of DHS under EO 13753 Peter] Gaynor purported to amend the order of succession [to list DHS Under Secretary for Strategy, Policy, and Plans Chad Wolf as Acting Secretary of DHS], potentially rendering [Gaynor's] action void. But a

47

> separate provision of the FVRA permits an acting official to serve "from the date of" a first nomination for the vacant office and "for the period that the nomination is pending in the Senate." Id. § 3346(a)(2). Because President Trump nominated Wolf [to serve as Secretary of DHS] the same day that Gaynor purported to amend the order of succession, Gaynor was lawfully serving as Acting Secretary under [EO 13753] and the FVRA at the time he amended the order of succession.

Northwest Immigrant Rts. Project, 496 F. Supp. 3d at 57–58 (emphasis added). Cases addressing Section 3346(a)(2) in the setting of a claim for benefits under the SSA have also found it to provide Berryhill with the authority to spring back into her role as Acting Commissioner. See Taylor v. Kijakazi, No. 1:21CV648, 2022 WL 4668273, at *9 (M.D.N.C. Aug. 2, 2022) (unpublished) (Webster, M.J.) (noting "agree[ment] with the other judges from this Court, Circuit, and others who have considered this issue at considerable length and concluded that this appointment clause argument [under the FVRA] has no merit"), recommendation adopted, 2022 WL 4621418 (M.D.N.C. Sept. 30, 2022) (unpublished) (Osteen, J.); Lance M. v. Kijakazi, No. 2:21CV628, 2022 WL 3009122, at *11 (E.D. Va. July 13, 2022) (unpublished) ("[T]he plain language and legislative history of the FVRA confirm that Berryhill could resume her service after Saul's nomination was submitted notwithstanding the fact that her original 210-day period expired before the Senate received his nomination."), recommendation adopted, 2022 WL 3007588 (E.D. Va. July 28, 2022) (unpublished); Williams v. Kijakazi, No. 1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022)

48

(unpublished) (characterizing holding in <u>Brian T.D.</u> as "an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and the Legislative Branch - all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired"); <u>Early v. Kijakazi</u>, No. 5:21CV96, 2022 WL 2057467, at *4 (W.D.N.C. June 7, 2022) (unpublished) (expressly disagreeing with <u>Brian T.D.</u> and holding: "[T]he plain language of 5 U.S.C. § 3346 allows for Ms. Berryhill to have resumed her role as Acting Commissioner on the date that Andrew Saul was nominated. Consequently, she had the necessary statutory authority to ratify the appointment the ALJs in 2018 and [the p]laintiff's [] argument fails."); <u>Thomas S. v. Commissioner of Soc. Sec.</u>, No. C21-5213, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022) (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that [] Saul was nominated for Commissioner in April 2018."); <u>Reuter</u>, 2020 WL 7222109, at *15 ("Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. . . . Immediately following the GAO[ Notice], [] Berryhill stepped down from her role as Acting Commissioner and continued to lead the agency from her [DCO]

49

position of record. . . . [H]owever, on April 17, 2018, the President nominated [] Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination."); Patterson, 2018 WL 8367459, at *1 ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [] Saul's nomination.").

Finally, the DOJ has, since at least 1999, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted. If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative. If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.

DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted). Like the DOJ, the GAO - the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, see GAO Notice, at 1 - also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to the Senate, see GAO, No. B-328888, "Violation of the 210-Day Limit

50

Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/ b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA "contains a <u>spring-back provision</u> that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official <u>whose initial 210-days had expired "could resume her service as</u> <u>Acting Director . . . when the President submitted [a] nomination</u> <u>to the Senate</u>" (emphasis added)).

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018. Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court should find that Berryhill lawfully ratified the SSA's ALJs' appointments as her own on July 16, 2018, and thus that Plaintiff's third issue on review fails as a matter of law.

51

### III.  <u>CONCLUSION</u>

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 18) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 21) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 10, 2023